IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARMEN L. RIVERA,            )
                             )
        Plaintiff,           )
                             )
            v.               )   Civil Action No. 08-220 Erie
                             )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security, )
                             )
        Defendant.           )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

　　Plaintiff, Carmen L. Rivera, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security, who found that she was not entitled to supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff filed an application for SSI on September 16, 2005, alleging disability since May 31, 2005 due to depression and post-traumatic stress disorder (Administrative Record, hereinafter "AR", at 66-72; 82). Her application was denied initially, and Plaintiff requested a hearing before an administrative law judge ("ALJ") (AR 37-39; 48; 50-54). A hearing was held on February 12, 2008, and on February 28, 2008, the ALJ found that Plaintiff was not disabled at any time through the date of his decision, and therefore was not eligible for SSI benefits (AR 19-26; 178-186). Plaintiff's request for review by the Appeals Council was denied (AR 5-10), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, I will deny both motions and the matter will be remanded to the Commissioner for further proceedings.

**I. BACKGROUND**

　　Plaintiff was born on April 22, 1985 and was twenty-three years old on the date of the ALJ's decision (AR 66; 88). She attended school through the tenth grade in Puerto Rico (AR 86; 129). Her past relevant work experience was as an assembler in a plastics factory for

1

approximately two months in 2003 (AR 74). Plaintiff was unable to communicate in English but was able to communicate in Spanish (AR 81).

Plaintiff was seen by Roger Esper, D.O., on several occasions for complaints of depression. On March 18, 2005, Dr. Esper diagnosed Plaintiff with depression and prescribed Lexapro (AR 126). Plaintiff complained on April 12, 2005 that the Lexapro was not working and Dr. Esper increased the dosage amount (AR 125). On April 25, 2005, Dr. Esper noted that Plaintiff continued to be depressed and needed someone to talk to; he continued her medication and referred her to Dr. Stillman (AR 125). Dr. Esper completed a Department of Public Welfare form stating Plaintiff suffered from major depression and was temporarily disabled from April 25, 2005 until March 25, 2006 (AR 122).

Plaintiff completed an Activities of Daily Living questionnaire on October 10, 2005 (AR 93-97). In this questionnaire, Plaintiff stated that she was able to care for her daughter, perform routine household chores, prepare meals, drive and handle her own bills (AR 93-94). She further stated, however, that she never left home without a family member accompanying her, was afraid of strangers, had no friends outside her family and feared her neighbors (AR 93-95). Plaintiff claimed she was unable to finish projects, follow a schedule, retain instructions, make decisions on her own, keep up with her work, concentrate for extended periods of time and had trouble getting along with supervisors and/or coworkers (AR 94-97).

On October 12, 2005, Betty Ferguson, a Counselor at the Crime Victim Center of Erie County, indicated that Plaintiff first contacted their agency on July 15, 2005 and requested counseling (AR 119).

On October 17, 2005, Dr. Esper reported that he treated Plaintiff on two occasions for depression and that she had stopped taking her antidepressant medication because she was in her second trimester of pregnancy (AR 121).

Progress notes dated October 17, 2005 from Belinda Stillman, D.O., reflect that Plaintiff was seven months pregnant and continued to complain of nightmares with respect to her previous miscarriage (AR 157). Dr. Stillman diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder and increased her Prozac dosage (AR 157).

On November 17, 2005, Plaintiff complained of sleep disturbances, forgetfulness, fear of

strangers in public places, sadness and occasional nightmares (AR 157). Dr. Stillman continued her on Prozac and increased her Ambien dosage (AR 157).

Plaintiff was psychologically evaluated on November 18, 2005 by Glenn Bailey, Ph.D. (AR 129-134). Plaintiff reported to Dr. Bailey that she was unmarried and lived with her aunt and daughter who was one year old (AR 130). She further reported a previous miscarriage and relayed a history of physical abuse from her mother (AR 129-130). Plaintiff claimed she had trouble sleeping, suffered from nightmares wherein she heard her dead child crying and had a poor appetite (AR 130-131). Plaintiff admitted suicidal thoughts but had never attempted to kill herself (AR 130). She indicated she was seeing a psychiatrist, receiving therapy and taking medication (AR 131).

On mental status examination, Dr. Bailey reported that Plaintiff presented as shy and quite anxious, exhibited a flat affect and her hands shook (AR 129; 131). She was unable to perform serial 7's and could not read or write (AR 131). She was able to produce clear and concise speech, although it was in Spanish, and her thought processes were intact (AR 132). No obsessions were noted during the examination, but Plaintiff stated she was fearful going out in public and did not leave her home unless someone was with her (AR 132). No delusions were reported but Dr. Bailey noted there were "questionable" auditory hallucinations (AR 132). Dr. Bailey found that she was in the low average, possibly borderline range of intellectual ability (AR 132). Her impulse control was sufficient and there were no known problems with her social judgment (AR 133). Dr. Bailey stated that her insight appeared to be "very poor" and he considered her prognosis "poor" unless she received proper psychiatric help (AR 133).

Dr. Bailey found that, based on Plaintiff's own description, she was able to perform normal household activities such as cleaning, maintaining a residence, paying her bills and maintaining her own health and hygiene without any significant problems (AR 133). She did not socialize, which Dr. Bailey indicated could be due to the language/cultural barrier or her shyness (AR 133). He found Plaintiff's ability to stay focused fluctuated based on her admission that she was unable to follow through with what she started (AR 133-134). He recommended that she seek outpatient mental health treatment, take English classes and be administered an IQ test in Spanish (AR 134). He diagnosed Plaintiff with major depression, recurrent, post-traumatic stress

3

disorder and social phobia, and assigned her a Global Assessment of Functioning ("GAF") score of 50 (AR 134).[1]

In connection with his evaluation, Dr. Bailey completed a Mental Functional Assessment form and concluded that Plaintiff was able to understand, remember, and carry out short, simple instructions; was slightly limited in her ability to understand and remember detailed instructions; and was only moderately limited in her ability to carry out detailed instructions and make simple work-related decisions (AR 127).

On December 1, 2005, Dalton Raymond, Ph.D., a state agency reviewing psychologist, completed a Mental Residual Functional Capacity Assessment form, and found that Plaintiff was not significantly limited in a number of areas, but was moderately limited in her ability to understand, remember and carry out detailed instructions and maintain attention and concentration for extended periods (AR 148). She was also moderately limited in her ability to work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers without distracting them; and respond appropriately to changes in the work setting (AR 148-149). On a Psychiatric Review Technique form completed the same date, Dr. Raymond concluded that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had no repeated episodes of decompensation of extended duration (AR 145). Dr. Raymond also found there was no evidence that Plaintiff was completely unable to function independently outside of her home (AR 146).

According to Dr. Raymond, Plaintiff could perform simple, routine, repetitive work in a stable environment; could understand, retain and follow simple job instructions; and make simple decisions (AR 150). Her daily activities and social skills were functional from a psychiatric

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed. 2000). Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

standpoint (AR 150). Dr. Raymond found she could function in a production oriented job requiring little independent decision-making and could manage the mental demands of many types of jobs not requiring complicated tasks (AR 150). He concluded Plaintiff could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment" (AR 150).

Plaintiff returned to Dr. Stillman on January 5, 2006 and reported that she was unable to leave her home by herself and was constantly tearful (AR 156). She reported suffering from suicidal ideations on a daily basis, but was able to control her thoughts due to her children (AR 156). She claimed she was scared of "everything" and continued to have sleep disturbances, a decreased appetite, forgetfulness and nightmares about her miscarriage and abuse from her mother (AR 156). Dr. Stillman diagnosed Plaintiff with generalized anxiety disorder, major depressive disorder and post-partum depression (AR 156). She increased Plaintiff's Prozac dosage and started her on Remeron (AR 156).

On February 9, 2006, Plaintiff reported poor sleep, a fear of strangers and nightmares of past traumas (AR 156). Dr. Stillman noted that she only had thoughts of self-harm "once in a blue moon" and her appetite had improved (AR 156). Plaintiff reported that her baby slept more at night and her sister helped with childcare (AR 156).

Plaintiff returned to Dr. Stillman on August 7, 2006 and reported that the Seroquel had been effective for her sleep disturbances (AR 155). She stated that she sometimes had thoughts of self-harm but was able to control them for her daughters, and heard voices with respect to her stillborn baby (AR 155). Plaintiff continued to complain of a decreased appetite (AR 155). Dr. Stillman assessed her with major depressive disorder and generalized anxiety disorder and continued her medication regimen (AR 155).

On September 14, 2006, Plaintiff complained of nighttime awakenings with anxiety and nightmares, but reported that she heard less voices (AR 154). Dr. Stillman increased her Paxil dosage (AR 154).

Plaintiff reported to Dr. Stillman on November 9, 2006 that she was doing fine and had no further nighttime awakenings and less nightmares (AR 154). Plaintiff claimed she suffered from nervousness during the day (AR 154). She was assessed with generalized anxiety disorder

and major depressive disorder (AR 154).

On February 27, 2007, Plaintiff presented to the Millcreek Community Hospital emergency room with complaints of suicidal ideation and was evaluated by Dennis Borczon, M.D. (AR 171). Plaintiff relayed her past abuse history, as well as her previous stillbirth (AR 171). She complained of having nightmares centered on her stillborn child, as well as recurrences of past abuse (AR 171). Plaintiff reported hearing her dead baby crying at times, even while awake, and that she had intrusive thoughts with respect to her past abuse (AR 171). She claimed her depressed feelings and intrusive thoughts were becoming increasingly worse (AR 171).

On mental status examination, Dr. Borczon reported that Plaintiff's affect was blunted, her mood was dysphoric and there was some intrusive thought centered around her stillborn child (AR 172). There was no evidence of pressured speech, poverty of speech, loosening of associations or ideas of reference (AR 172). Dr. Borczon noted that Plaintiff complained of hallucinations consisting of shadows that move, as well as hearing her stillborn baby cry (AR 172). She thought people were out to get her and did not feel safe, and admitted to suicidal ideation with a plan to overdose (AR 172). Dr. Borczon found her attention, concentration and short term memory was grossly intact (AR 172). Her insight and judgment were poor to fair (AR 172). Dr. Borczon diagnosed Plaintiff with major depressive disorder and post-traumatic stress disorder, rule out bipolar disorder, and assigned her a GAF score of 35 upon admission (AR 172).[2]

During her admission, Dr. Borczon prescribed medications, and reported that Plaintiff "did benefit from the individual, group and recreational therapy" (AR 172). Her psychotic symptoms improved and her mood stabilized (AR 172). On discharge, Dr. Borczon found that her mood had improved and she showed no evidence of psychosis or delusional thought process (AR 172). She denied any thoughts of self-destructive behavior, her memory was intact and her judgment and insight were fair (AR 173). Plaintiff was willing to comply with outpatient

---

[2]Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)." *Id.*

psychiatric follow-up and medication therapy. She was assigned a GAF score of 60 [3] and her discharge medications included Paxil, Clonidine, Seroquel and Vistaril (AR 173). Plaintiff was discharged on March 2, 2007 in satisfactory condition with instructions to follow-up at Stairways Behavioral Health (AR 173).

Plaintiff began treatment with Stairways beginning in March 2007 (AR 162-170). A psychiatric evaluation conducted by Matthew DeJohn, M.D., noted Plaintiff's previous admission to the hospital for a suicide attempt, but that she was not on any medication and admitted a history of medication noncompliance (AR 162-163). Plaintiff reported symptoms of post-traumatic stress disorder, including nightmares, intrusive thoughts, excessive worrying and hypervigilance (AR 162). She further reported occasionally hearing the sound of her stillborn child crying, but denied any other psychotic symptoms or delusions (AR 162).

On mental status examination, Dr. DeJohn reported that she appeared somewhat restless and had minor psychomotor agitation (AR 163). Her speech was spontaneous and fluent, her thought process linear and organized, with no flight of ideas or loosening of associations, and her affect was reactive and somewhat anxious (AR 163). Plaintiff was not flattened in any way and she displayed humor at appropriate situations (AR 163). Dr. DeJohn indicated that she appeared to be of average intelligence, was cognitively grossly intact and her insight and motivation were good (AR 164). Dr. DeJohn diagnosed her with major depressive disorder, post-traumatic stress disorder, chronic, rule out social phobia and rule out generalized anxiety disorder (AR 164). He assigned her a GAF score of 50, advised her to abstain from marijuana use, prescribed Zoloft and Benadryl (for insomnia) and scheduled her for counseling sessions (AR 164).

Finally, on January 7, 2008, Medication Management Visit notes from Stairways reflect that Plaintiff complained of increased depression and mood instability (AR 166). She reported constant auditory disturbances, claiming that she heard her baby crying and a male voice saying "bad things" (AR 166). Her medications were adjusted and she was instructed to return in four weeks (AR 166).

---

[3]Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." *Id*.

Plaintiff, represented by counsel, and her sister-in-law testified at the hearing held by the ALJ on February 12, 2008 (AR 178-186).[4] Plaintiff testified that she only worked through a temporary agency in 2002 and did not work in 2006 and 2007 (AR 182). She further testified that there had been no change in her mental condition since she completed the questionnaire for the ALJ (AR 182).

Maggie Aquino, Plaintiff's sister-in-law, testified that she saw Plaintiff on a daily basis at Plaintiff's home and that she was familiar with her daily activities and routines (AR 184). Ms. Aquino testified that Plaintiff required assistance going to the store and paying bills (AR 184). She testified that she or other family members checked on the Plaintiff daily, making sure the children were fed and bathed because Plaintiff needed a reminder to perform these tasks (AR 184). Ms. Aquino stated that she or other family members took turns watching Plaintiff's children since they had concerns leaving them in the Plaintiff's care (AR 184). According to Ms. Aquino, Plaintiff did not want to leave her home, cried all the time and claimed she heard voices (AR 185).

Following the hearing, the ALJ issued a written decision which found that Plaintiff was not eligible for SSI benefits within the meaning of the Social Security Act (AR 19-26). The Appeals Council subsequently denied Plaintiff's request for review (AR 5-10) rendering the ALJ's decision the final decision of the Commissioner. She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

---

[4]Plaintiff testified through a Spanish interpreter (AR 180).

8

### III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Plaintiff's case at the fifth step. The ALJ found that Plaintiff's affective disorder and anxiety-related disorder were severe impairments, but determined at step three that she did not meet a listing (AR 21-22). The ALJ further found she had the residual functional capacity ("RFC") to perform the full range of unskilled work at all exertional levels and could perform the basic mental demands of unskilled work (AR 22). The ALJ concluded, after considering the Plaintiff's age, education, work experience and RFC, and without consulting a vocational expert, that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (AR 25). The ALJ also found that Plaintiff's statements concerning the limiting effects of her mental impairments were not totally credible (AR 23). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first challenges the ALJ's finding at step three of the sequential evaluation process. Step three requires a determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1. *See* 20

9

C.F.R. § 404.1520(d). A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Commissioner*, 220 F.3d 112, 119 (3rd Cir. 2000). A claimant bears the burden of proving that her impairments meet or equal a listed impairment. See *Adorno v. Shalala,* 40 F.3d 43, 46 (3rd Cir. 1994).

Plaintiff contends that the ALJ's analysis at step three is flawed because he failed to explicitly discuss and/or weigh relevant, probative evidence which establish that her mental impairments met the requirements of Listing 12. 04, Affective Disorders and 12.06, Anxiety Related Disorders. See Plaintiff's Brief p. 7-11. Both of these Listings consist of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The required level of severity for 12.06 anxiety-related disorders is met when "the requirements in both A and B are satisfied, or when the requirements in A and C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

Here, the ALJ found that Plaintiff failed to meet the B criteria (AR 22).[5] The paragraph B

---

[5]The ALJ further found that Plaintiff's mental impairments did not meet the C criteria of Listing 12.04 or Listing 12.06 (AR 22). Listing 12.04 requires:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms of signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

requirements of Listing 12.04 and 12.06 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B). The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with a claimant's ability to "function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C. The ALJ found that Plaintiff's affective disorder and anxiety-related disorder did not meet part B because the evidence reflected only mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and Plaintiff had experienced no episodes of decompensation (AR 22).

Plaintiff does not challenge the ALJ's findings with respect to concentration, persistence or pace; rather, she focuses her arguments on the ALJ's findings relative to her activities of daily living, social functioning and episodes of decompensation. In connection with these findings, the Plaintiff argues, *inter alia*, that the ALJ erred in failing to address and/or acknowledge her GAF scores assessed by her mental health providers. *See* Plaintiff's Brief p. 10. A review of the ALJ's decision reveals that he did not specifically discuss Plaintiff's GAF score of 50 assessed by Drs. Bailey and DeJohn (AR 134; 164) or Dr. Borczon's GAF score of 35 upon her admission to Millcreek Hospital (AR 172) for a suicide attempt. Plaintiff's GAF scores of 50 indicate

---

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1§ 12.04(C).

Listing 12.06 requires a "complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06(C).

11

serious symptoms, including an inability to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

Pursuant to the final rules of the Social Security Administration, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *See* 66 *Fed.Reg.* 50746, 50764-65 (2000). Nonetheless, the GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *Id.* As such, "it constitutes medical evidence accepted and relied upon by a medical source and *must* be addressed by an ALJ in making a determination regarding a claimant's disability." *Watson v. Astrue*, 2009 WL 678717 at *5 (E.D.Pa. 2009) (emphasis in original), *citing Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D.Pa. 2006); *see also Santiago-Rivera v. Barnhart*, 2006 WL 2794189 at *9 (E.D.Pa. 2006) (case remanded since claimant's GAF score of 50 indicated serious symptoms and ALJ failed to discuss score); *Span v. Barnhart,* 2004 WL 1535768 at *7 (E.D.Pa. 2004) (absent from ALJ's discussion was any meaningful indication of how he considered claimant's GAF scores or discounted their significance); *Escardille v. Barnhart,* 2003 WL 21499999 at *7 (E.D.Pa. 2003) (case remanded because ALJ failed to mention claimant's GAF score of 50 which constituted a specific medical finding that claimant unable to perform competitive work).

Because the ALJ is required to give some reason for discounting the evidence he rejects, *see Adorno v. Shalala,* 40 F.3d 43, 48 (3rd Cir. 1994), and the ALJ's decision here fails to address the GAF score evidence, I am unable to conclude that his decision is supported by substantial evidence. The case shall be remanded to the Commissioner who is directed to specifically discuss this evidence on remand.

Plaintiff next challenges the ALJ's application of the medical-vocational guidelines to decide her case without utilizing a vocational expert. *See* Plaintiff's Brief pp. 11-12. In 1978, the Secretary of Health and Human Services revised the system for determining whether jobs exist in the national economy by promulgating the medical-vocational guidelines (the "Grids"). *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Grids were promulgated in order to establish the types and number of jobs that exist in the national economy for claimants with exertional impairments. See 20 C.F.R. § 416.969. The Grids consist of a matrix of four factors

including physical ability, age, education and work experience, and provide guidance as to whether a particular combination of all four factors direct a decision of "disabled" or "not disabled." *See Sykes v. Apfel*, 228 F.3d 259, 263 (3rd Cir. 2000); *Santise v. Schweiker*, 676 F.2d 925, 928 (3d Cir. 1982). In order to mechanically apply a Grid rule to direct a decision of "disabled" or "not disabled", the claimant's residual functional capacity, age, education and work experience must coincide exactly with those in the rule. *See Mason v. Shalala,* 994 F.2d 1058, 1064 (3rd Cir. 1993); *Santise*, 676 F.2d at 928; Social Security Ruling ("SSR") 83-11, 1983 WL 31252, at 2. Otherwise, the Grids may only be used as a framework for the ALJ's decision.

In cases involving nonexertional impairments:

> [T]he general rule is that reliance on the Grids in lieu of an individualized assessment by a vocational expert is inappropriate in cases of pure nonexertional limitations because the Grids are designed to address primarily exertional limitations. However, the Social Security Administration has created an exception, stating that an ALJ may refer to the Grids when he relies on a Social Security Ruling (SSR) "that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects the claimant's occupational job base." AR 01-1(3); *see also Allen v. Barnhart*, 417 F.3d at 396, 404 (3rd Cir. 2005).

*See Fahy v. Astrue*, 2008 WL 2550594 at *5 (E.D.Pa. 2008) (footnote omitted). Mental impairments are generally considered to be nonexertional. *Fahy,* 2008 WL 2550594 at *5 n.2. Thus a determination of disability is possible by applying the Grids without reference to vocational evidence in cases involving mental impairments. *See Allen v. Barnhart*, 417 F.3d 396, 404 (3rd Cir. 2005) (holding that in a case involving purely nonexertional limitations, "the ALJ's use of the [Grids] as a framework in this case, and his reliance upon an SSR at Step 5 to determine [the claimant's] occupational job base is not an improper application of either the case law or rules established by the Agency").

The ALJ here concluded that the Plaintiff had the RFC to perform a full range of work at all exertional levels and could perform the basic mental demands of unskilled work, which included the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers and usual work situations; and deal with changes in a routine work setting (AR 22). The ALJ further concluded:

> The claimant's ability to perform work at all exertional levels has

13

> been compromised by nonexertional limitations. However, these
> limitations have little or no effect on the occupational base of
> unskilled work at all exertional levels. A finding of "not disabled"
> is therefore appropriate under the framework of section 204.00 in
> the Medical-Vocational Guidelines as supported by SSR 85-15.

(AR 25). Ruling 85-15 "provides a framework for decisions concerning persons who have only a nonexertional limitation(s) of function" and contains hypothetical examples of persons with nonexertional impairments and the effect of those limitations on their ability to perform certain types of work. *See* SSR 85-15, 1985 WL 56857 at *1; *Fahy,* 2008 WL 2550594 at *5. Plaintiff claims that the ALJ's reliance on SSR 85-15 in lieu of vocational expert testimony was in error since he failed to relate Plaintiff's limitations to the cited Ruling.

The Third Circuit has made clear that "if the Secretary wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." *Allen,* 417 F.3d at 407. In *Allen*, the ALJ found that the claimant had the RFC for simple routine repetitive work at all exertional levels. *Id*. at 400. The ALJ then concluded that "a finding of not disabled was reached by application of medical-vocational rule 204, Appendix 2, subpart P, Regulations Part 404, used as a framework for decision making. The mental limitations for simple, routine, repetitive work do not significantly erode the base of jobs that claimant is capable of performing. (SSR 85-15)." *Id*. The Third Circuit concluded this finding was not supported by substantial evidence:

> Notwithstanding the ALJ's reference to, and apparent reliance on,
> this Ruling, we are at a loss to find within the Ruling itself the
> conclusion the ALJ seems to find regarding the occupational base
> for one with Allen's mental limitations.
>
> The ALJ makes broad statements regarding Allen's RFC, as we
> referenced above, but his conclusion only addressed in general
> fashion the "mental limitations for simple, routine, repetitive
> work." It does not reference any aspect of SSR 85-15 that relates
> Allen's particular nonexertional limitations to the occupational job
> base. Thus, we have difficulty in determining what the ALJ
> believed were Allen's "mental limitations for simple, routine,
> repetitive work," and how they fit into the various categories or
> examples set forth in SSR 85-15. ...
>
> Looking at the ALJ's conclusory reference to SSR 85-15, we
> cannot determine whether he was relying upon a specific aspect of
> the Rule in a permissible way, or whether, by contrast, he found

> certain limitations to exist which would require, under the dictates of the Rule itself, an individualized determination. Looking at the record before us, we cannot help but note that certain aspects of Allen's mental disorder-including response to supervision and stress, and the like-would more likely be subjected to an individualized assessment.

*Allen*, 417 F.3d at 405-407.

Similarly, in *Meyler v. Commissioner of Social Security*, 238 Fed. Appx. 884 (3rd Cir. 2007), the Third Circuit found fault with the ALJ's reliance on this Ruling in lieu of vocational expert testimony since the ALJ failed to explain how the claimant's mental impairments related to the categories or examples set forth in SSR 85-15. In finding that the ALJ's decision was not supported by substantial evidence, the court stated:

> The ALJ did not explain why, under SSR 85-15 ... Meyler's nonexertional impairments did not prevent her from meeting the mental demands of unskilled work. The ALJ partly addressed Meyler's anxiety disorder by stating that unskilled jobs usually involve working with objects rather than people, but he did not expressly consider Meyler's alleged anxiety when in public places or working near other people. ...

*Meyler*, 238 Fed. Appx. at 890.

Finally, in *Fahy v. Astrue*, 2008 WL 2550594 (E.D.Pa. 2008), the claimant suffered from depression, bipolar disorder and a substance abuse disorder. The ALJ found that she retained sufficient attention and concentration to understand, remember, and follow instructions, but was limited to unskilled work. *Fahy*, 2008 WL 2550594 at *3. Relying on the Grids and SSR 85-15, the ALJ concluded that the claimant's ability to perform work at all exertional levels was not significantly compromised by her nonexertional limitations. *Id*. The Magistrate Judge found there was no "fit" between the claimant's nonexertional impairments and the Rule, since there was an apparent inconsistency between the ALJ's conclusion that she had "moderate" impairments and his determination that her ability to perform work was not significantly compromised. *Id*. at *6. The Commissioner argued that the claimant's nonexertional limitation to unskilled work "already captured these moderate limitations." *Id*. In adopting the Magistrate Judge's decision, the court held:

> The Third Circuit has expressly held that "if the Secretary wishes to rely on an SSR as a replacement for a vocational expert, it must be *crystal-clear* that the SSR is probative as to the way in which

15

> the nonexertional limitations impact the ability to work, and thus, the occupational base." *Allan,* (sic) 417 F.3d at 407 (emphasis added). At Step 5 of his analysis, the ALJ stated in summary fashion that "claimant's ability to perform work at all exertional levels is not significantly compromised by her non-exertional limits," but failed to discuss any of Plaintiff's limitations or how SSR 85-15 is probative of the way in which these limitations impact Plaintiff's ability to work. *See id.* at 404. SSR 85-15, by its own terms, makes clear that it is a mere framework, and does not "direct conclusions of disable or not disabled." Although the ALJ summarily states that there are numerous jobs in the economy that Plaintiff can perform that do not require special skill or experience, he cites none of the categories or examples listed in SSR 85-15, and makes no effort to explain how Plaintiff's specific impairments would impact her ability to perform unskilled work. Because the ALJ has failed to make "crystal clear" that the SSR is probative as mandated by the Third Circuit, and because the Court cannot determine, based on the current record, whether the ALJ's reliance on the SSR as a substitute for the individualized assessment of a vocational expert was proper, remand to the Commissioner is appropriate.

*Fahy*, 2008 WL 2550594 at *6.

Consistent with *Allen, Meyler*, and *Fahy*, I find that the ALJ's reliance on SSR 85-15 in lieu of vocational expert testimony is not supported by substantial evidence. Similar to the ALJ's explanation found deficient in *Allen*, it is unclear what the ALJ believed the Plaintiff's "nonexertional limitations" were and how they correspond to the Ruling. For example, the ALJ concluded at step two that the Plaintiff had moderate difficulties in maintaining social functioning, finding that the medical evidence supported the Plaintiff's claim that she disliked being around others and did not feel safe (AR 22). He further found she had moderate difficulties with respect to concentration, persistence or pace (AR 22). Absent from the ALJ's decision, however, is any discussion on how these limitations would impact her ability to perform unskilled work. I reject the Commissioner's argument that the ALJ "fully accommodated Plaintiff's credible mental limitations by restricting her to unskilled work." *See* Defendant's Brief p. 9. I view this argument as simply a variation of the argument rejected by the court in *Fahy*, namely, that any moderate limitations the claimant suffered were "already captured" when the ALJ limited her to unskilled work. *Fahy*, 2008 WL 2550594 at *6.

Because the ALJ failed to identify the Plaintiff's specific mental limitations and "fit" those limitations within the Ruling, I am unable to conclude that the ALJ's reliance on the Grids

16

was appropriate in this case. Consequently, the case shall be remanded to the Commissioner to more fully articulate the specific limitations caused by the Plaintiff's mental impairments and their impact on her ability to perform unskilled work consistent with Third Circuit case law. As stated in *Allen*, "[t]his can be accomplished by noting how SSR 85-15 is relevant and controlling- if indeed that is the case-or by obtaining the individualized assessment that SSR 85-15 seems to prefer by way of vocational expert." *Allen*, 417 F.3d at 407.

On a final note, if the Commissioner on remand intends to rely on SSR 85-15 as a substitute for vocational expert testimony, or any other Ruling for that matter, advance notice should be given to the Plaintiff "as a matter of fairness" so she can determine whether to call her own vocational expert. *Allen*, 417 F.3d at 407-08 (noting that advance notice is not required but stating "as a matter of fairness, alerting a claimant to the relevant rule in advance will always be appropriate"); *Meyler*, 238 Fed. Appx. at 890 ("[b]ecause the ALJ provided no notice to [the claimant], we give close scrutiny to his reliance on SSR at step five").

## VI. CONCLUSION

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARMEN L. RIVERA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Civil Action No. 08-220 Erie |

### **ORDER**

AND NOW, this 20th day of April, 2009, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 7] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 11] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

                                                                     s/ Sean J. McLaughlin
                                                                     United States District Judge

cm: All parties of record.